We have five cases on our calendar this morning, three patent cases, one from the PTAB, two from district courts, a trademark case and a case from the Court of Federal Claims that is being submitted on the briefs and will not be argued. Our first case is Apotex et al. v. Novartis, 2018-2209, and others. Ms. Ray. Thank you, Your Honors. It's a pleasure to be before you this morning. This is a rather simple, straightforward case. At the very beginning, I'd like to emphasize that when I speak about Fingolimid throughout this argument, I'm referring to the 0.5 milligram dose because that's the dose that's of greatest commercial interest for this drug. Okay, this is a simple, straightforward case. In the orange book is currently listed two patents. One is the 229 patent. It just expired in August. It was the active pharmaceutical ingredient. It got a fulsome 17 years after issue life with five years of new chemical entity exclusivity. So today what we have is the 405 is the sole remaining patent in the orange book. It expires in 2027, and there's six total claims, and that's the only thing standing between allowing generic Fingolimid to get on the market. Now we've removed the 103. Those are jury arguments. We're really talking about claims, right? I am, I am. And entitlement. Correct, correct. I am indeed, Your Honor. All right, I'm focusing just on the claims of the 405 patent. So there's one anticipation issue before the court. We removed the obviousness rejections to make this as clear and as simple as possible. So there's three independent claims, and all three of those independent claims have this negative limitation. And should the court, what the argument is today is should the 405 patent be, or the 504 patent be awarded the benefit of its earliest British priority date, which is in 2006. There's an intervening piece of prior art, Capos 2010. And right now, what our position is because that negative... Haven't we held before that in the context of PTAB proceedings, assessing whether a patent's entitled to a priority date is not a decision on written description, it's entitling priority date, which is necessary in order to resolve whether the prior art asserted is correctly prior art? So the British... I'm sorry? I'm not asking you about your facts. I'm saying, haven't we held before that it's fair game within the PTAB to have them look at whether there is written description support when somebody is claiming priority to an earlier filing date? Absolutely. So that's not a question of written description. It's a question of priority entitlement. That's correct. Okay. So... And you think that... I can't see any reason why that should matter just because this is a continuation as opposed to a CIP. That's correct. It shouldn't make any difference. Because you don't always call a CIP a CIP, and that's totally correct. But what was done here essentially was a CIP, and new information was added to the patent specification. So very quickly with this issue, what Novartis has tried to do is... Yeah, but you don't need new... I mean, you're not basing your argument on new information, right? You're basing your argument on the fact that at no point in time was this negative limitation disclosed. That's correct. Well, until it was introduced into the claims in the amendment in this particular patent that was filed in 2014. So it could be considered a CIP, I guess, and so you give it the benefit of that negative limitation could get the benefit at the 2014 date. That's correct. But your argument is that it doesn't appear in the 2006 application, and therefore you don't get – they don't get entitled to the 2006 application date. In very short terms, I totally agree with that. And therefore, that capos anticipates? That's correct. And there's nothing in the specification that alludes to, suggests, mentions remotely loading doses, never mentioned in this patent. What about the testimony? The expert who said that's fairly clear from the 2006 application? So Novartis does try to remedy that, to look at – they try to look at the patent specification. They have two experts that have provided testimony, but frankly, you could have as many experts as you want that say what a POSA would glean from the specification. But the bottom line is there's nothing in the patent specification for them to address. There's no hook for them there. Is it your point that that's a question of patent law, entitlement to an earlier date, rather than something suitable for expert testimony? That's correct. I don't think expert testimony was effective in this case because there wasn't language in the patent specification for them to assist us understanding how a patent was made. All right. So Capos, we assume, is – we have the position that Capos 2010 is indeed intervening prior art. You say you have a position, but the board said patent owner does not dispute that Capos discloses each element of the claims. They never tried to distinguish Capos 2010 throughout any of their documents, Your Honor. Well, we'll hear what they have to say. We'll hear what they have to say, right. So then, what Novartis did is they filed a contingent motion to amend before the PTAB. It wasn't fully considered. It was considered to be moot. And what they did is at the very bottom of the – I'm struggling to understand how the amendment is any different. I'm probably – this is what you would call a friendly question. I'm struggling to understand how the amendment is any different than the claim, in fact, if anything, it's even broader than the claim that's under consideration. So I'm – I don't know that we have to spend much time on that. To the extent it's not impermissibly broadening, they back right into the very same prior art they were trying to avoid. So that is indeed our position. And I mean, I know that the office hasn't actually ruled on the motion to amend. Is it your view that should we agree with you completely all the way through and believe this is a reversal and a remand – and I don't mean a vacating remand, I mean a reversal and a remand – do we need – nonetheless have to remand it so that the board can consider the amended claim? That is indeed my position, Your Honor. I think this case is so – Really? Because I would have gone further for you. I would have said that we don't have to remand for the amended claim because the amended claim is insignificantly, non-substantially different from the claim they're seeking, and thus – So no remand is necessary. That's what I would have said, but you've argued to the contrary, and I'm not going to let you switch positions now. Okay, sorry if I misspoke. You didn't misspeak, you said your position clearly. It was the position I understood you took from your briefing, so – but I probably would have been willing to go further. So at this point, we say we do not believe there is a reason for a remand because the claim, I do think, is broadening and just walks right back into the same prior art. We also have a standing issue before us that we don't think you necessarily need to address because the standing issue is only directed to Argentum. Apotex's standing has not been challenged. So the standing issue we don't believe has to be addressed. The threat of imminent harm, if I could just historically look at this case, once the PTAB wrote the final written decision in this case and it published, within a matter of days, Navarrette has filed over 20 lawsuits. So the threat of imminent harm to Argentum is very real in this case, and we believe that all the elements of standing, even as to Argentum, are met should the court want to address Argentum's standing in this matter. We can save the rest of your time for rebuttal, if you like. Thank you so much, Your Honors. Ms. Lowe. May it please the court. Appellants say the board failed to apply a heightened written description standard, but Santeros is a case-specific ruling, and Nike and Infy make clear no higher standard is required. The test for sufficient written description is whether the disclosure of an application reasonably conveys to those skilled in the art that the inventor had possession of the invention as of the filing date. But this is a claim limitation, and it isn't found in the 2006 application. Well, Your Honor. It's not a question of heightened or lowered. It's just not there. Well, literal support isn't required under the law in the specification, and Ariad sets out the well-settled law that the test is how a person of skill would perceive the description that's offered by the application itself in view of the state of the art. And we have undisputed evidence below from two experts on Appellee's side that's actually in harmony with Dr. Geisser, appellant's expert, that the state of the art, as well as the application, teaches that no loading dose would be the message to the person of skill. But wouldn't you say that even the negative limitation has to find support in the specification? Well, Your Honor, I believe that it needs to find support in the specification as perceived by the person of skill. And here there are, you know, my colleague talked about there being no hook in the specification. That's not in their briefing, but was just argued. And I disagree. There are many hooks in the specification. For example, the word daily, daily dosing regimen, is one of the key aspects of the invention here. And a person of skill in this art would immediately recognize that that would exclude a loading dose. There's specific evidence even using the word exclude from Dr. Steinman on that exact point, as well as Dr. Jesko. So that's one hook. Another hook is the indication here, RRMS, multiple sclerosis. That's not the only indication in the art that Fingolimod was used for. Fingolimod was used in transplant, and indeed with a loading dose. And that would be well known to the person of skill in this art. And the message from this application would- In the case of Santeros, we say that a negative claim limitations are adequately supported when the specification describes a reason to exclude. Is there a reason to exclude here? Yes, Your Honor. In the specification? Yes, Your Honor. The daily dosing description will and has told a person of skill that there should be no loading dose, that a loading dose is to be excluded. And does it give a reason for that exclusion? A reason would be known to a person of skill in the art because of the adverse effect bradycardia, which is a slowing of the heart rate. It's known to people of skill that Fingolimod causes that adverse effect. Just as in Santeros, there were adverse effects from that compound. It would be known to a person, and there's testimony undisputed, way beyond substantial evidence below, that that would be known. Santeros is a case that's decided on its own facts, and it does not set out a higher standard. Nike and Infy explicitly say so. Written description is determined in a case-by-case, application-by-application way. And negative limitations are no different. Santeros merely identifies one way negative limitations can be supported. And appellant's briefs quote pieces of Santeros, and the sentence Your Honor just quoted, but link those pieces together with imperative language like must and require. But no such commandments are evident in Santeros. And Nike and Infy echo that, that that requirement isn't a requirement, that the well-settled law in Ariadne of written description is what the standard is. As I mentioned, the evidence below from Dr. Steinman and Jesko is unrebutted. And Dr. Geisler's testimony is in harmony. Even if the law required a reason to exclude, which we believe it does not, the board actually did analyze this question below. Indeed, the word exclude is used by Dr. Steinman several times. For example, at A3269. Is it your argument that the reason to exclude can be inherent in the specification? No, Your Honor. Our position is that the reason to exclude is assessed by looking at how a person of skill perceives the application disclosure. And it could be inherent, but it- Doesn't that leave a person of skill in the art guessing and just searching for the needle in the haystack? No, Your Honor. It would mean that the person of skill in the art reads the specification and would immediately understand the message. And hear that the experts undisputably read the specification and immediately know it's a daily dose. We know it's fingolimod. We know about bradycardia. No loading dose here. It's an immediate understanding, just as one would read the words on the page. But because of their background, they have the benefit of the backdrop of the state of the art in their mind. And they read it, and it's their perception that is the test. So here- The reason to exclude may have been pertinent to the cases in which it was talked about. But that's obviously not a criterion for whether there is written description or support to gain entitlement in an early date. Yes, Your Honor, exactly. In Santeros, the parties actually framed up their argument in terms of a reason to exclude. And the court below made a decision based on a reason to exclude. And therefore, the federal circuit addressed that direct question. And that is why the Santeros case is written in terms of a reason to exclude. It's a case-specific issue to Santeros. Nike and Infy recognized that later in time. And they addressed that and put it back into the context of a fact-specific case. One of the things I don't understand about your argument is this is a very fact-specific question, and we review it for substantial evidence. And you've pointed us to the testimony of your experts that indicated when the word daily dosing is used, what that means. But the board cited Dr. Trusco and his testimony that the recitation and the patent of the daily dose would be understood as clear and complete by IPOSA. And the absence of any preceding loading dose being mentioned would be understood. So is it your view that because of all of those... I guess I'm just not following exactly what you're arguing. Can you explain it? Sure, Your Honor. Our argument is that the well-settled test for written description, as set out by Ariad, is from the perspective of a person of ordinary skill in the art. And below, we have all three experts, experts from both sides, in harmony, showing that a person of skill would understand for several reasons in reading the specification that there should be no loading dose, that the loading dose should be excluded. One reason is there were specific complete dosing regimens provided for in the application. It's the heart of the invention, the 0.5 milligram dosing regimen. And they would take from that that there should be no loading dose. They would also know from the art, because they're a person of skill, that bradycardia was a risk. Now, bradycardia was a risk for transplant patients, but still a loading dose was given. Here, in multiple sclerosis... But, Doctor, I mean, the board found, and this has nothing to do... So there's really two different arguments in my mind, and one is the Sam Taras argument about whether there has to be a reason to exclude mentioned in the spec. And you're saying, no, there doesn't have to be. That in Sam Taras, they said, when there is a reason to exclude mentioned, that's good enough. But they didn't say there always has to be. And I understand your point on that. But the other point is there has to be some hook in the specification. There has to be something in the spec that would lead a skilled artisan to understand that this excludes a loading dose. And I don't see any of the experts, Dr. Jusko or Dr. Steinman, pointing to any spec language that does that. And those are two different points. You've blended them all together, which is why I'm kind of confused, but I feel like they're different points. Well, Your Honor, the experts do point to specific aspects of the specification. The disclosure of daily dosing as the complete regimen for giving the 0.5 dose is in the specification. There are two examples in the specification. One is a human example of dosing. Where do the experts point to the spec and which portions of the spec in particular do you think they're relying on? At A3269, Dr. Steinman says, the dosing schedule necessarily excludes a loading dose. I'm sorry, where is that, 3269, Dr. Steinman's declaration? What paragraph? I have Dr. Steinman's declaration at 3347, but you must be referring to something else. Where are you telling me to look? 32 what? 3269. Okay, there we go. Got it? Yeah, what paragraph? 183, Your Honor. Paragraph number 183 does not appear on page 3269. 3348. Apologies. 3348. Okay, paragraph what? 183 and 184. Well, okay, this just says, the patent mentions daily dose and nothing in the patent says use a loading dose. How is, I don't see that that gets you where you need to go. But what you're talking about is testimony that relates to medical opinion rather than a patent law question whether claim limitation is in a particular application. That's a different story. Well, Your Honor, I'm... Maybe the best you could have done, but it's different. Well, Your Honor, I believe that first of all, the person of skill here is a medical doctor and therefore their understanding of what the specification is telling them is really the evidence, the facts, upon which the legal determination will be made. And here, all three medical doctors are seeing the same facts. Number one, that a daily dose tells them to exclude a loading dose. And number two, that bradycardia is known and therefore is a risk in that also in our RMS. What it doesn't say is the reason to exclude. So a person may apply that medical training would lead one to exclude, but don't we require that there be some sort of description? In the case of Infi, that followed the other case, and, Teresa, we're talking about, in that case we said that whether a specification of the challenge patent provides a person to exclude is sufficient to satisfy the description. So it's talking about describing the reason to exclude. And doesn't describe mean something other than the absence or something that's inherent? Well, I think that the law is clear that there does not need to be literal, inhoferba support for a limitation in a claim. And I also believe that here, Nike and Infi both make clear that the standard is the Ariad standard. And the Ariad standard takes into account the person of skills perspective. In this case, there's no dispute about the person of skills perspective. It is that... Well, the dispute is, there's no dispute that these people understand daily dose to mean a daily dose and not necessarily to include a loading dose. In fact, at the end of 184, which you pointed me to, his conclusion is a person of skill would need neither to call for a loading dose. But there's a difference between whether the word daily dose implies the existence of a loading dose and whether daily dose excludes the possibility of a loading dose in addition. And that's a really big difference. Well, there was, there was, there is a difference. And a daily dose to the person of skill means that you're giving 0.5 daily each day. But it doesn't mean you're not giving anything else. I think in this claim... That's what the testimony doesn't seem to say to me. What the testimony says is, when they say daily dose, this is how I understand it. But that doesn't mean the person's not taking anything else, it seems. I believe Dr. Jesko said, a person of skill would know not to add in any other features to the prescribed dosing regimen, which... But he didn't cite the spec at all. Well, I believe in his declaration, this is all about how he would be reading the specification. Your time is almost up. Do you mind if I move you from this to some of the questions I was asking opposing counsel about if we were to disagree with this assessment of priority, what should happen in this case? Well, the appellants, if they are held to their papers, the board should affirm... The panel should affirm the board. I don't understand that. If we determine that there is, in fact, no priority, and thus this reference should be considered for anticipation, what happens? Well, if the panel is of that view, then there should be a remand. We have a motion to amend that should be addressed below by the board. But there was no... You didn't question whether CAPOS is in anticipation. You seem to have conceded it earlier. The board said you did. Do you disagree with that? I believe that the claims in the motion to amend were not something that was assessed by the board. Answer Judge Lurie's question directly. Not with regard to the amended claims. The board found in two places, both the institution decision and the final decision, that you did not dispute that CAPOS 2010 did, in fact, anticipate your claims if it was a reference that could be used, and you didn't respond to any of those comments. CAPOS 2010 is the publication of the full clinical trial. There's pretty much no question in it. Yeah, we would need to focus on other aspects. So what you think because you amended, but I guess my problem is that your amended claim is not substantially different from the exact same argument you're making on appeal. All you did was take out the negative limitation, but add in consisting of, which actually narrows the claim even further. It narrows the claim in exactly this way, the same way, which isn't supported. So if I conclude you don't have support for narrowing your claim to eliminate the possibility of a loading dose, and you eliminate not just the possibility of a loading dose, but the possibility of a loading dose or anything else, you still don't have support for it. Well, Your Honor, we are limiting the claim even more. So the idea of an up-titration is also excluded in the amended claim. Yes, but if you don't have support for one of the things you're trying to exclude, it doesn't matter that you're limiting it even more, right? Yeah, but our view is that we do have support, and the recitation of daily and... Yes, but I'm saying if we don't agree with you on that, if we don't agree with you on that, it's hard for me to understand how there's any daylight between that and your amended claim, what there would be for the board to need to think about on remand. The claim would be even narrower, and the board would need to make a new assessment on this now narrowed claim. I understand that if the premise here, which we don't agree with, is that the claim as written would be not supported, the board would need to make a new determination based on an even narrower claim. Thank you, Ms. Love. Your time has been exceeded, and we have your position. Thank you, Your Honors. Ms. Ray. Thank you, Your Honors. As I indicated, this is a simple case, and I don't agree with or acquiesce with much of what was just said before, but I don't see any reason to go through it in detail. But essentially, Santoros and INFI are the law. They set the standard, and Nevada's can't. Well, they don't set the law as to whether a limitation is met in a prior application or not. They just dealt with the circumstances of those cases. That's correct. And our position is that the board erred, though, in not properly applying Santoros and INFI and applying the standards set forth therein. And also, we do not believe that a remand is necessary. Well, why, for the amended claim? I don't know what to do about that amended claim. So the amended claim... That's the words consisting of, which substantially narrows the claim to eliminate more than just the loading dose. And in our brief... Do you agree with that? Could you repeat that, Your Honor? Doesn't adding the words consisting of narrow the claim more than just by eliminating the no-loading dose? Consisting of means this and nothing but this, right? That's correct, but that only relates to the very last clause of that daily dosing regimen of the claim. You still have the comprising language much earlier in the claim, the linking language that left a lot open. And in our brief, our corrected final brief, we did put a hypothetical Claim 7 there where we put in two different dosage regimens. We hypothetically added another one because the comprising linking language  in the process or in the method of treatment. The comprising was there before. That's correct. So I don't understand how you think that broadens the amended claim. The word comprising was there last time and it's there now, the amended claim. So it's always been very open. Because of the comprising language, there can always be additional steps in the method of treatment claims. And that comprising language was not changed. It didn't become consisting of. Consisting of only related to the very end of the claim, the very bottom part that related to the daily dose of 0.5 milligram. It wasn't the main linking phrase that was converted from comprising to consisting of. In which claim does consisting of appear? In the contingent motion to amend. It's in Claims 1, 3, and 5, I believe. Can you tell me where that is in the appendix? Okay, it's on page 910. I'll help you. Page 910 is the amended claim. Proposed substitute Claim 7 to replace original Claim 1.    Proposed substitute Claim 7 to replace original Claim 1. And what was the contingency? The contingency was to remove the negative limitation and to introduce the word consisting of. There never was a comprising in the claim. Well, there was a comprising in the claim. That's not correct. There always has been a comprising in the claim. The comprising was the original linking phrase at the very top. And it's still there. And it's still there, correct. But how does, when you change this to consisting of, the dosing regimen consisting of, their argument is that this narrows the claim more than just eliminating a loading dose. It eliminates other things. But it still has the comprising at earlier, the earlier step in the method of treatment claim. And that open-ended comprising language still gives the opportunity to introduce a loading dose before administering the daily dose. Anything further, Ms. Ray? I'm sorry? Anything further? No. No, Your Honor.  And I take the case as advised. Thank you.